We're ready to hear from the appellant. Yes, ma'am. Ma'am, I'm going to try and reserve five minutes. Okay. Joining me here today are County Commissioners Adams, County Commissioner Lyman, and County Commissioner Benally is supposed to be here so she may arrive late. Thank you. Thank you, ma'am. I represent San Juan County in this matter. We're here on a redistricting case, as you're well aware, out of San Juan County, obviously. The court ordered the school board district and the county commission districts to be redistricted, removed all of the candidates or the officials from office, including Navajo and non-Navajo, ordered special elections that took place last week. And as expected, if you pack a super majority of Navajo Democratic voters in districts, they're going to win. And they did. You want to pull the mic closer to you there? Yes, ma'am. Thank you for that. As a consequence, we have a population of Navajo Democrats that comprises, depending on how you count Indian, between 50 and 51.9% of the county, holding two-thirds of the elected offices. We think that violated the Constitution. We think that violated the Voting Rights Act. And we think it's plain, in the words of Judge Posner, out of the Frank versus Forest City case, absurd. And he talked about these kind of absurd results you get when you put a you don't approach redistricting at the local level. And this is very local when you get into school districts in a county like San Juan. When you try to hold these standards on national election districting, it doesn't work. And San Juan County is an amazing place. The people are amazing. I don't know if you've been there. The landscape is amazing. It's huge. It's vast. It takes hours to drive the one road north-south, two lanes. And the population is divided. The Navajo Democrats live on the southern border of the county where the reservation is. Most of the white Republicans live in the north, up by Moab. The center, as it so happens, is about 50-50. And I think what the court did is shown, I think, perhaps best by some charts. And these are in our brief. And in the court's rulings, and I attached them to, I took those rulings and put them as part of the addendum to the brief. The court's final plan for the three county commission districts is in the addendum at page 168. It's also in the appendix, but I don't have that. Here are the three districts. No, it's the school board. I've got to go back. I'm sorry. We have the exhibits. If you would tell us where you think, legally, the district court erred, that would be helpful. Yes, ma'am. I think the district court erred in considering this racial gerrymandering. We had that consent decree that was entered in 1986. So you're saying, again, that you had to do what you did because of that consent decree. Yes, ma'am. And going into this, the Namaho thought we did. They appeared before the county commission and said we've got to amend that consent decree. The county commissioners thought they had to do it. The Department of Justice told them you'd better obey it. Well, the consent decree is a very brief document, and it seems to say only that you can't have just one vast single district. You have to have multiple districts. But there's gloss. There's factual gloss that went on that, ma'am. And that is the meetings in developing that plan that had to be approved. And what they did, they met with the Department of Justice, and the court found this. We had to submit it to the Department of Justice, and they told us what they wanted. And it's undisputed in the record. They told us we want a district super-packed with Namaho voters, so one of the three commissioners will always be Namaho. But we're guided by the consent decree now and the language of the consent decree. I just don't see that. I don't. Can you point me to anything in the consent decree or the settlement agreement? But we go back. I mean, the court can say it goes back and says you've got to come back. And basically you negotiate with the government. You come back and you give them that, the court that decree that the government signed off on. We want this. This is a map. This is what we want. And they come and monitor the elections every election year. I mean, so the county is under the impression, no matter how you read that consent decree, the county understood that it was bound by it. The Namaho Nation thought they were bound by it. Their own experts said we were bound by it in the sense that we couldn't dilute the vote in District 3. Now, were we wrong? I don't think so, but we could have been. But it wasn't an intentional racial gerrymandering. And look at the school board district. They strike down the school board or a new election the district court does because of, there's two reasons. It says racial gerrymandering. Well, there was no racial gerrymandering in the school board elections. That was done on the physicality, the geographics, demographics of the county and the locations of the schools. Well, the population deviation, for instance, on the school boards climbed up to 38%. Ma'am, I didn't hear you. I said the population deviation on the school board district had climbed up to 38%, right? Yes, ma'am. And you had not taken any action, and that you're saying is because of the, you thought that that deviation was essentially required or by the consent decree somehow? It was not required. Well, it was in a sense. If you wanted good schools, and the schools arrived at the school board themselves, including the Navajo members, arrived at this notion of a community school concept. The county is so big with isolated communities. They said the best way to have a school board is to have five school districts. We'll form the districts around the high schools and include in those districts the feeder schools, elementary schools and junior high schools that feed those schools. Yes, the population percentages will vary because, you know, there are more people in Blanding than there are in Bluff. But it makes you, it provides for having representatives who live in that community where the schools are. Well, the district court found that that particular interest, which seems to be the primary interest you're advocating on appeal at least, you had several interests you argued were compelling below, but that seems to be your focus on appeal. And the district court said that that interest didn't predominate, couldn't take precedence over the deviation, the substantial deviation here, and didn't permit that, didn't allow for that. Well, but the court, I think we have to look at the Frank case, the Forest County case, where they said, look, when you get into these, you know, in Forest County there was only 1,400 square miles. We've got 8,000 here. There were 15,000 people in, 10,000 in Forest County. We have 14,000 here. And how did the court distinguish that? It said, well, it's really not persuasive because in Forest County they were picking 21, or districting for 21 council seats. Here we only have five. But the fact is, when you look, and this is the other part on it too, and the court did this in its plan. So this shows about the school board districts. This is an addendum, page 168. It's the court's order. Stop seeing the plans. Look at the school board districts covering hundreds of miles. And one of them, District 3, I think, only has one school, an elementary school. And what the court did on all of its plans, when you look at this and the other ones I'm going to talk about, it publishes on the plans, public record, the percentage of Native American voters. District 5, 88.5%. District 4, 85%. I mean, a public record should publish on there the percentage of Native voters in that district. And it did the same thing with the County Commission District. This is in the addendum at page 161. District 1, Native percent, 10%. District 2, Native percent, 65.8%. District 3, Native percent, 80%. In the public record. That's what the public sees when they look at the redistricting. Now, what does that do to a county that's split 50-50, Navajo Democrats, 50-50, non-Navajo Republicans? That is not good. That doesn't produce, I don't think, for a good respect and a healthy respect for the government. And that brings to me, and briefly to the case I advise the court of as supplemental authority, and I want to try to reserve, as I said, a few minutes. The Benzik case that was decided last week, it was a, first time I've ever seen it, a redistricting case challenged on First Amendment associational grounds. And you say at first blush, what does that have to do with anything? Well, when you read the case, it's pretty similar. It concerns vote dilution, diluting Republican votes by packing them into a district and leaving other districts with Democratic voters. This is what I love. It says, why was it illegal or unconstitutional? Under the First Amendment, it burdened associational interests by substantially diminishing their ability, the Republicans' ability to elect their candidate of choice. Isn't that Section 2 language? It's the exact language out of Section 2. It only talks to race. You can't burden the ability of people to elect the candidates of choice on the basis of race. Section 2, we just put political instead of racial. Then the third point. They used a DRI, what they called a Democratic Performance Index, to do the redistricting. And they said, this predicts how many Democrats it will take to elect their candidate in the district. And they came out with 58%. And they said, that does it. In our case, we've got the minimum of 65% supermajority, and it goes all the way to 80%. Next point. The results of the gerrymandering, they said, is exactly what you would expect. That's true here. In that case, in the Benzik case, the Democrats won in those districts. In this case, the Navajo Democrats win in their district where they have a supermajority. Do we have a problem here as far as the school districts are concerned with the violation of Utah law? Because it requires reapportionment of school districts to meet population compactness? Ma'am, that happened. But it wasn't... Every ten years you have to do that, and it hasn't been done for 26 years? But I guess I would say in justification for that, after every census, the county clerk would sit down with the school board and say, should we do anything about it? And the school board, unanimously, all these years, including the Navajo members, said, no, it works the way we have it now. We are producing the best schools we possibly can with what we have to work with here. That has been turned on its head now, as I said. And I reserve the rest of my time. Thank you. Thank you. Good morning, Your Honors. Paul Spruan, Assistant Attorney General for the Navajo Nation Department of Justice. On behalf of the Navajo Nation, I have with me for the individual plaintiffs Mr. Steve Bowes. I'd like to split our time. I'd like to focus on the merits rulings of the district court, and Mr. Bowes can discuss the remedial decisions. And we collectively ask you that you affirm three merits rulings of the district court. The first, this case does not affect the 1984 consent decree in any way. The second, District 3 of the county commission was a gerrymandered district by race in violation of equal protection. And third, the 38 percent deviation in the school board districts violated the one-person, one-vote doctrine. And on the first one, as has already been discussed, there is nothing in the consent decree that required the particular drawing of the county commission districts. It simply was an agreement with the United States and the county that you're not going to use an at-large district. The nation was not a party. The county attempted to reopen the case, and the United States Department of Justice opposed, and the district court ruled there's nothing that affects the consent decree in any way here. Therefore, it did not bind the district court in any way to hear the nation's case. On the District 3 county commission, it was a blatant racial gerrymander. That was the intention. The record showed it was intentionally loaded with 88 and then with the difference in population. It became 92. There was no other intent involved. So under the Miller case, the predominant motivation in that case, in that situation, was to load Navajos into one district. Now, strict scrutiny will then apply because it was the predominant factor, and the compelling governmental interest the county brought up in the district court only was the consent decree, but it's been established that doesn't affect this at all. There was a belated attempt on appeal to discuss Section 2 of the Voting Rights Act with an assertion with no evidence whatsoever that what they were trying to do was comply with Section 2. Now, of course, Section 2 does not require any particular majority minority districts and definitely does not apply a loaded Navajo district of 92 percent. To be narrowly tailored to that belief, there has to be some basis in evidence, some good reason to show that, in fact, we are trying to fulfill Section 2. There's no evidence at all that they were trying to do that. The evidence shows they apparently had some belief as to what the consent decree required, as has been shown that simply is not true. Now, on the school board, 38 percent deviation, of course, is way beyond the 10 percent so-called safe harbor. Therefore, justification had to be put forward to not violate one person, one vote, as has already been presented this morning. That's in direct violation of Utah state law anyway. Utah state law, as Judge Briscoe has noted, requires an adjustment every 10 years for equal population. It cannot be a justification, whatever standard is appropriately applied to the one person, one vote issue. All the other reasons, some of which were raised in the district court, some of which were raised on appeal, simply do not justify this significant deviation. Geography, they were able to deal with geography and make one person, one vote in the county commission district, so obviously geography did not prevent them from doing so. And so there really was no justification whatsoever that can support this significant deviation. Therefore, there is no error in any of these decisions put forward by the district court. And I'm happy to take questions, or I can cede the rest of my time. What do we do about the community schools? That's a good argument that the county is raising. They're trying to organize their school districts and persons on the board to represent areas that are compact, representing their school districts. It's a good idea, don't you think? I don't think that compelled a 38 percent deviation. When the district court asked them, they said, well, if you're going to do one person, one vote, make sure it fulfills this alleged policy about community schools. So even the county at the time believed it was possible to do so. So it doesn't mean that you can't have a one person, one vote, even if you're allegedly organizing it based upon school structure. So I don't believe that that excuses the 38 percent deviation at all, assuming that was even a policy, which there was some question in the record as to whether there was an official policy. But that policy was not considered inconsistent by the county at the time. Well, if you're going to do one person, one vote, at least supply some equal population. Thank you. I can have Mr. Bowes present his argument. Thank you. Thank you. Good morning. Good morning. Once the district court determined that the school board election districts and the county commission election districts violated the Equal Protection Clause, although for slightly different reasons, the county was ordered to develop a remedial plan for the commission and the school board. Established case law gives the legislative body first crack at drawing a lawful plan, which the county made an attempt at doing. In its reply, the county says it did this first by looking at deviation, then by looking at traditional districting principles, and then followed by some minor adjustments to reflect racial proportions in the county. That representation in the briefs, the county's briefs, is false and flatly contradicted by the record. The question that they were presented with, in their view, is how do you divide three districts, three districts for the county commission and five districts for the school board, when the racial proportions show in the county that there's a nearly even split of about 52%, 48%. So the way they went about it for the county commission, for example, is to say, one district gets a white majority, one district gets a Navajo majority, and a third district is created from everything that's left over, according to their expert, Mr. Brace. And the population in that everything left over district matches that racial proportion, 52% to 48%. So they achieve this idea of racial proportionality that was their guiding principle in putting these remedies together, proposed remedies, which is why you end up with this rather bizarre result where a white suburban Spanish Valley, which is actually a suburb of Moab, is paired with Navajo Mountain, which is five and a half hours away and has an impoverished Navajo population and virtually no relationship in terms of communities of interest. The county's expert even acknowledged that following traditional districting principles and putting the remedial plans together would result in a plan with, quote, two seats that are 65% or so Indian and one seat that is white, unquote, which is, quote, much more than what proportionality says that they, Indians that is, are entitled to. The court found that this predominant use of racial classifications to draw the remedial plans violated the equal protection. Because the county failed to propose a lawful plan or lawful plans, the district court appointed a special master, Bernard Groffman, to develop lawful plans. Those plans were adopted after extensive opportunity for comments from the parties and input from the public. The county objected to those plans because they said they subjected, as we've heard this morning, white Republicans to a Section 2 violation, Section 2 of the Voting Rights Act, but made absolutely no effort to present evidence showing how white Republicans were subject to historical election discrimination in San Juan County, which would be a preliminary step in finding that there was a Section 2 violation. At one of the hearings, Judge Shelby went through each of the gingles factors and the Senate factors that you need to show in order to find that there's a Section 2 violation, asking the county whether it had any evidence on those factors regarding white Republicans. The county had none, evidently arguing that the violation was self-evident in some way and didn't need the kind of factual development the federal courts ordinarily require to show a Section 2 violation. Consequently, the district court approved both plans. The elections that took place tend to show that Dr. Groffman and the district court hit the nail on the head with regards to the plans that were developed. The county has argued that the district court drew the plans in a way designed to ensure the election of a Navajo majority on both the school board and the county commission, but in the school board election, District 3, which Judge Shelby identified as the Swing District, because it has a slight Indian majority, the non-Indian candidate defeated the Indian candidate by a wide margin last week. Judge Shelby did an extremely careful and meticulous job in this case  and his decisions, the three merits decisions, as Mr. Spruan mentioned, deserve to be upheld. I have one other point I wanted to make about Judge Briscoe's school community question. It's unclear that it would have been possible to divide the schools in the county the way the county has asked anyway. There are only four high schools and there are five election districts. So some district is going to be left out of the mix no matter what. The other thing is if you take a look at Judge Shelby's decisions with regard to Dr. Groffman's plans, they went to great pains to try and accommodate the so-called school community concept and did so as best they could, understanding that it wasn't as high a requirement as some of the other standards that had to be met in the case. If you have no other questions, I don't have anything else to say. Is there a problem with the splitting of landing, the city? They contend there is a problem. Well, the problem is there's nothing in the record to... and the amicus position correctly. They have some idea that blanding represents some area, not defined, that goes outside the boundaries of the incorporated city. There was never any evidence put before the court that this greater view of blanding, whatever it is, actually exists or where its boundaries might be, which causes, which makes it impossible to do the kind of math that's required to draw district boundaries. The other problem... And that, excuse me, that's the only way then that you get to this question of splitting blanding is if you accept the concept that blanding extends into areas that are not within the municipality? Well, their argument is based on this notion that we've split what's called a community of interest under traditional districting principles. Right. But they put on no proof of what that community of interest actually is. The other thing, as is noted by Dr. Groff... The community of interest can't simply be like a suburban boundary, is what you're saying. Well, the easiest way of doing a community of interest is to look at something like the legal boundaries. But it's, as with the example I was mentioning of Spanish Valley and Navajo Mountain, you look at things like whether there's common infrastructure, common roads, common ethnic breakdown, common views on a variety of issues, whether incomes are similar. That's why there's no community of interest between Navajo Mountain and Spanish Valley. But with regard to this idea of a greater blanding, the county put on no evidence. So it's just sort of this amorphous, God knows where it flows, concept. The other thing you have to think about with blanding is that it represents the largest concentration of population in the county. And in order to make the one person, one vote standard work, it has to be split no matter what you do. And even the county admitted that. Thank you. Thank you. Ma'am, there are five high schools in the county, not four. There's Monument Valley, Navajo Mountain, Blanding, Whitehorse, and Monticello. And each one is organized around these school districts. We talk about, under the county's plan, how extensive the commission districts are. Again, looking at the end of page 161, Commission District 3 goes from the Arizona border almost into Grand County. And it did the same thing with the school board districts. So this notion that we kept them compact, they being the plaintiffs, and the county's plan was absurdly expanded is not true. And it's unfair what they've done and said about Dr. Brace. What Dr. Brace said was, okay, this is how he did it. He said, first I did the plan. I pulled out the numbers and put them on the map. And then for Section 2, I have to look at the racial makeup after that to make sure that I'm not diluting the votes. And he said, normally you would do a voter strength analysis based upon block voting and stuff like that. The information wasn't available. So he did a second fallback position with the Supreme Court of Supruto called proportionality. They say if each segment of the voting population has a chance of winning a seat that's proportional to their numbers, it's okay. It passes Section 2 muster and constitutional muster. So in other words, if we had only two districts and one was 100% Navajo and one was 100% non-Navajo, perfectly legal. The problem is we've got three districts and a population that's almost the same. So Brace went back on a proportionality concept. And that's why if you look, again, at addendum pages 188 and 189, he drew his population maps with the precincts for both the school board elections and the county commission elections. Why wouldn't you use census blocks and not precincts? I mean, if you're getting to one person, one vote, wouldn't the census blocks be there? The court ordered census blocks. And it's a nightmare because it changes with every census. There are 4,000 of them in the county. The way voters typically registered was to point on a map where they lived. And then that map was this one. And they can say, oh, you live over here, you live in precinct 2. That would be precinct 2 for the precinct 15 for the county commission district. And can't voters still do that? Point to a map? Can't voters still do that and point to the map and say, this is where I live? No, ma'am, because this thing, where do you know what are the features here? And, again, this is just a county commission map. Well, you could easily put that over a map. But then you have a school district map that goes over top of that. You can do that, too. In the precincts, though, census blocks are like amoeba. And they're all different sizes. But they have a lot of detail on them, don't they? Don't they even have more detail in terms of the various local landmarks than do your precinct blocks? And I think the argument was that it should be even easier to point on a map with the detail on the census blocks. In that sense, they do, ma'am, except they're called split census blocks as they overlap between one precinct or two precincts or three precincts will be covered in there. No one knows where they are in that. It may be like this. I mean, people, they register there by saying, I live 10 miles north of LaSalle Creek. I live five miles northeast of the end of Highway 32. I live just before you get to Comb Wash. We know where just before you get to Comb Wash is on the county's maps. On the census block matters, we're going to have to go over and over and over again. But the point you make here is on Brace. Brace did exactly that. Because there was no voter historical voting strength analysis, he went proportionality. And that's exactly what Dr. Groffman did. He did the same thing. He did first, he did the map, then he looked at the percentages. And we point out to the court, hey, our guy did the same thing, only it's predominantly racial when we do it. When he does it, it's not. He took our figures and kicked them up 15 percent to pack Navajo voters in all those districts and to super pack the non-Navajo Republican voters in District 1 and the other school districts. Thank you. Thank you, Counsel. Do you have other questions, Judge? No, I'm fine. Thank you. Thank you. Thank you. Thank you all for your arguments this morning. The case is submitted. We will take a 10-minute break at this time. When we return, we'll hear arguments.